Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 3365 | DATE | December 31, 2003 |
| CASE TITLE | LaSalle Bank National    v    Bank of America National | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Hearing
(5) ■ Status hearing set for 2/17/04, at 9:00 a.m.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Memorandum Opinion and Order entered. Accordingly, defendant's motion to dismiss is granted in part and denied in part. Plaintiff is directed to file an amended complaint on or before 1/19/04. Defendant's answer is due by 2/9/04.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | JAN 02 2004 | |
| X | Notices mailed by judge's staff. | | date docketed | 14 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| GDS | courtroom deputy's initials | 04 JAN -2 PM 9:50 Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LASALLE BANK NATIONAL ASSOCIATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No.   03 C 3365 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| BANK OF AMERICA NATIONAL ) | |
| ASSOCIATION, ) | |
| ) | |
| Defendant. ) | |

DOCKETED
JAN - 2 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff LaSalle Bank National Association has brought a four count complaint against defendant Bank of America National Association alleging breach of contract (Counts I and III), breach of fiduciary duty (Count II), and gross negligence and misrepresentation (Count IV). Defendant has moved to dismiss portions of Count II, all of Count III, and a portion of Count IV. For the reasons set forth below, the motion is granted in part and denied in part.

### FACTS

Plaintiff claims that defendant breached various duties owed to it in connection with a "Participation Agreement" under which plaintiff participated in some, but not all of defendant's loans to Trendmasters, Inc., a toy manufacturer and distributor. Defendant was Trendmasters' lender under three separate lines of credit: (1) a $32 million line of credit consisting of a Revolving Loan, a Subfacility Letter of Credit Commitment and Term Loan (the "General Line of Credit); (2) a $10 million Interest Hedge Agreement; and (3) a $10 million line of credit designed to support Trendmasters' Hong Kong operations (the "Trade Line of Credit").

The General Line of Credit was created pursuant to a Loan Agreement ("Loan Agreement") executed between defendant's predecessor, Nations Bank, and Trendmasters. In conjunction with the Loan Agreement, the parties executed a general security agreement which identifies Trendmasters' assets serving as collateral for the General Line of Credit to include essentially all personal property of Trendmasters, including all present and future accounts, general intangibles, notes, drafts, acceptances, documents, instruments, bank deposits, inventory, goods, and all proceeds of the foregoing.

Shortly after entering into the Loan Agreement, the parties executed a Trade Finance Agreement which created the Trade Line of Credit. The Trade Line of Credit was designed to provide Trendmasters with funds necessary to purchase toys from Chinese and other foreign manufacturers for later distribution to retailers in the United States. The Trade Finance Agreement authorized defendant to extend credit to Trendmasters under six different loan and credit line facilities, one of which was known as the "Packing Loans." The Trade Finance Agreement authorized defendant to extend up to $2.5 million in Packing Loans to Trendmasters to enable the company to make required payments to the Chinese and other foreign manufacturers. Up to that $2.5 million cap, the amount of Packing Loans defendant could extend to Trendmasters was limited to 45% of the value of valid and acceptable original export letters of credit from Trendmasters' toy retailers that were lodged with defendant (the "advanced rate"). The collateral for the Trade Line of Credit, including the Packing Loans, was included in the collateral described in the general security agreement that secures all the loans under the Loan Agreement, specifically the General Line of Credit. The Trade Line of Credit Agreement specifically provides that the credit facilities

established under that agreement "at all times will remain cross-collateralized and cross-guaranteed with the Loan Agreement."

On June 18, 1999, plaintiff and defendant executed a "Participation Agreement" through which plaintiff purchased a 40% participation share in the loans under the Loan Agreement (the General Line of Credit). Plaintiff did not purchase any interest in the Interest Hedge Agreement or the Trade Line of Credit Agreements, including the Packing Loans. Under the Participation Agreement plaintiff's interest in the General Line of Credit loans was secured by the Trendmasters assets that comprised the collateral securing the loans under the Loan Agreement and general security agreement.

Beginning sometime in April 2001, defendant increased the Packing Loans beyond the $2.5 million cap and in excess of the "advance rate" stated in the Packing Loan documentation. Defendant did this without plaintiff's consent and, apparently, without a written amendment to the Trade Finance Agreement.

The Revolving Loan under the General Line of Credit was not paid when due on August 15, 2002. An event a default was not declared, however, until October 17, 2002. After the event of default was declared defendant set-off amounts in Trendmasters' Hong Kong bank account, but did not share the proceeds with plaintiff. During the two month period between the maturation of the revolving note on August 15, 2002, and the declaration of an event of default on October 17, 2002, Trendmasters paid down an accumulated total of over $6 million in Packing Loans and other obligations under the Trade Line of Credit.

After the declared default, Trendmasters' loan obligations were accelerated and defendant set-off additional monies held in Trendmasters' bank account. Thereafter, much of Trendmasters'

remaining assets were sold pursuant to a consensual foreclosure sale. After recovering its costs for collection of the collateral, defendant paid itself the entire amount of proceeds set-off from Trendmasters' Hong Kong bank accounts to satisfy a portion of Trendmasters' obligations to defendant under the Trade Line of Credit. Defendant did not distribute the collateral in accordance with the provisions of the Participation Agreement.

## DISCUSSION

Although the complaint was brought in four counts, some counts have multiple claims. As defendant correctly notes, plaintiff's asserted claims allege three forms of wrongdoing: (1) defendant's failure to share the proceeds of the set-off from Trendmasters' Hong Kong bank account (the "set-off claims"); (2) defendant's alleged improper handling of the Packing Loans ("Packing Loan claims"); and (3) defendant's allegedly wrongful delay in declaring an event of default on the General Line of Credit (the "default declaration claims"). Defendant's motion attacks the Packing Loan claims and the default declaration claims only.

1. Packing Loan Claims

The Packing Loan claims are set forth in part of Count II, all of Count III, and part of Count IV. In those counts, plaintiff alleges that defendant, without plaintiff's consent and without written amendment, increased the amount of the Packing Loans beyond the $2.5 million cap, in excess of the original 45% advance rate. In Count II, plaintiff alleges that defendant's actions breached a fiduciary duty owed to plaintiff created by the Participation Agreement. Specifically, plaintiff alleges that prior to Trendmasters' default on the General Line of Credit, defendant increased the Packing Loans, thereby increasing the risk of default of those loans, and increasing the risk that Trendmasters' collateral would be paid to defendant only, without any sharing with plaintiff.

4

Plaintiff also claims that defendant increased the advance rate without consulting plaintiff or obtaining plaintiff's consent.

In Count III, plaintiff alleges that defendant's actions breached § 3.1 of the Participation Agreement, which provides that subject to two inapplicable exceptions, "any amendment to the Loan Agreement or any of the other Loan Documents shall require the affirmative vote of both Lead Bank [defendant] and Participant [plaintiff]." The parties appear to agree that the term "Loan Documents" as defined in the Loan Agreement include the Trade Finance Agreement and thus the Packing Loans.

Count IV alleges that by expanding the Packing Loans and the allowing Trendmasters to pay off the expanded Packing Loans with collateral that was pledged under the Loan Agreement, defendant committed gross negligence.

Defendant's attack on these claims stems from the plain wording of three provisions of the Participation Agreement. First, Recital E of the Participation Agreement provides:

> The . . . trade letters of credit exposure [including the Packing Loans] are specifically excluded from this Agreement and the participation purchased by Participant hereunder."

The Recitals, however, are not incorporated into the agreement and, under Missouri law[1], can be used to find the intent of the parties only when the operative language of the contract is ambiguous, uncertain or indefinite. Missouri Highway and Transportation Commission v. Maryville Land Partnership, 62 S.W. 3d 485, 492 (Ml. Ct. App. 2001). That language is none of these things.

Two operative provisions of the Participation Agreement make clear, as defendant argues, that plaintiff had no right to participate in the Packing Loans and defendant had no obligation to

---

[1]Both the Participation Agreement and the Loan Agreement provide that they are governed by Missouri law.

plaintiff with respect to defendant's handling of those loans. Section 5 of the Participation Agreement provides that:

> **Trade Letters of Credit; Interest Hedge Obligations.** Participant is not purchasing an interest in the Trade Letters of Credit or the Interest Hedge Obligations, and the Trade Letters of Credit and the Interest Hedge Obligations are not a part of the Loans. Any collateral securing solely the Trade Letters of Credit and/or Interest Hedge Obligations does not secure both Loans. Nothing contained here shall grant Participant any right, and Participant has no right, to make any decisions, vote on any actions, or take any actions, with respect to the Trade Letters of Credit or the Interest Hedge Obligations, and Participant acknowledges and agrees that all such actions and decisions shall be made solely by Lead Bank in Lead Bank's sole and absolute discretion without any duty or obligations owed to Participant. Participant has no right to share in any set-off rights Lead Bank may have against Borrower or its assets which are held by Lead Bank solely to secure the Trade Letters of Credit or Interest Hedge Obligations, pledged to Lead Bank solely to secure the Trade Letters of Credit or Interest Hedge Obligations, or in which Lead Bank has a Security Interest solely to secure the Trade Letters of Credit or Interest Hedge Obligations. Participant waives any rights to cause Lead Bank to marshal assets with respect to any collateral securing solely the Trade Letters of Credit and/or the Interest Hedge Obligations.

Additionally, § 2.3 of Amendment No. 1 to the Loan Agreement, dated the same day as the Participation Agreement provides:

> Notwithstanding the foregoing, Participant has no right to make any decisions, vote on any actions, or take any actions, with respect to the Trade Letters of Credit or Interest Hedge Obligations. Participant has not purchased any interest in the Trade Letters of Credit or the Interest Hedge Obligations.

According to defendant, these provisions demonstrate that it had the sole and exclusive right to alter the terms of the Packing Loans, and thus plaintiff can have no claim based on defendant's actions with respect to those loans. Defendant argues that the specific provisions of § 5 and 2.3 "trump" the general provisions in § 3.1, requiring plaintiff's affirmative vote on any amendment to the Loan Agreement. In particular, defendant argues that each of these specific provisions contains language that elevates it over the general provisions of § 3.1. Both specific provisions contain

language indicating "notwithstanding" anything contained herein, thus acknowledging that the two provisions might be inconsistent with other provisions of the agreement. Read together, according to defendant, § 3.1 requires plaintiff's vote on any amendments dealing with the General Line of Credit (the loans in which plaintiff purchased a participation), while §§ 5 and 2.3 make clear that no vote is necessary with respect to the Trade Line of Credit including the Packing Loans or the Interest Hedge Agreements, the loans in which plaintiff did not purchase a participation share. Additionally, defendant correctly notes that under Missouri law, if there is an inconsistency between a specific and general provision in a contract, the specific provision controls. See Robins v. McDonnell Douglas Corp., 27 S. W. 3d 491, 497 (Ml. App. Ct. 2000).

In response, plaintiff raises the incredulous argument that § 5 of the Participation Agreement admittedly limits plaintiff's right to participate in decisions or vote on or take actions with respect to the Packing Loans, but not with respect to what plaintiff unilaterally terms the "Excess Packing Loans." In essence, plaintiff argues that § 5 specifically provides that plaintiff has no rights with respect to any decisions made by defendant regarding the Packing Loans unless defendant increases the loans beyond what which was set out in the Trade Finance Agreement. This argument is nonsensical and rejected by the court. Section 5 is clear an unambiguous. It provides that plaintiff has no rights with respect to the Trade Line of Credit under which the Packing Loans were created. The contract could not be any clearer and the express provisions of § 5 and 2.3 negate any claim by plaintiff that under § 3.1 it had a right to vote on any amendment to the Packing Loans. Accordingly, plaintiff's breach of contract claim (Count III) and any breach of fiduciary duty claims arising out of defendant's unilateral increase in the Packing Loans (Count II breach of fiduciary duty and Count IV gross negligence) fail to state a claim and are dismissed.

2. Default Declaration Claim

The default declaration claim is set forth in the second part of Count II, alleging that defendant wrongfully delayed in declaring an event of default on the General Line of Credit, allowing Trendmasters to use the collateral securing the General Line of Credit to reduce the balance of the Packing Loan. Defendant raises two challenges to this claim. First, defendant argues that § 3.1 of the Packing Agreement requires the affirmative vote of both plaintiff and defendant to declare an event of default and that plaintiff never voted on or demanded that an event be declared. Second, defendant argues that the Participation Agreement expressly disclaims any fiduciary duty owed by defendant to plaintiff with respect to defendant's handling of Packing Loans.

Section 2.40 of the Participation Agreement provides that any money paid to defendant pursuant to the Loan Agreement at any time after the occurrence of a default or an event of default shall be applied according to the set-off procedures. Plaintiff alleges that default occurred, but that defendant failed to declare an event of default for the sole purpose of avoiding application of § 2.4. If plaintiff is correct, any money received by defendant on the Packing Loans from the sale of collateral that was cross-collateralized with the General Line of Credit could be subject to the provisions of § 2.4. Therefore plaintiff has stated a claim under § 2.4 of the Agreement.

Plaintiff cannot, however, state a separate claim for breach of fiduciary duty, because § 4.2 of the Packing Agreement expressly provides that "[defendant] shall not have any duties or responsibilities except those expressly set forth in this Agreement and except as set forth in § 2.4 and 4.3, shall not be a trustee or fiduciary for Participants. Defendant therefore owed no duty to plaintiff except as defined in the Agreement. See First City Federal Savings and Loan Association v. Worthren Bank and Trust Co., 919 F.2d 510, 514 (9th Cir. 1990) (Fiduciary relationship should not

be inferred from a Participation Agreement absent unequivocal contractual language. Banks and savings institutions engaged in commercial transactions normally deal with one another at arm's length and not as fiduciaries.) Accordingly, defendant's motion to dismiss the default declaration claims in Count II, based on defendant's failure to set-off payments received from Trendmasters on the Packing Loans made from the sale of collateral securing the General Line of Credit after default on the General Line of Credit is denied.

## CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is granted in part and denied in part. The motion is granted with respect to the first part of Count II, all of Count III and the first part of Count IV. The motion is denied in all other respects. Because the breach of contract claim in Count I is not addressed in this opinion, and because plaintiff's other viable claims overlap in the remaining counts, plaintiff is directed to file an amended complaint conforming to this opinion on or before January 19, 2004. Defendant is to file an answer thereto on or before February 9, 2004. This matter is set for a report on status February 17, 2004, at 9:00 a.m., at which time the parties are to present a final discover plan.

**ENTER:** **December 31, 2003**

*[signature]*

**Robert W. Gettleman**
**United States District Judge**